DREW, J.
Lin this workers’ compensation action, the City of Shreveport (“Shreveport”) appeals a judgment denying its exception of res judicata; ordering it to pay past, present, and future benefits, including temporary and total disability (“TTD”) benefits; finding that the claimant, Louis Flanigan, aggravated a hernia injury in a work-related accident; and ordering Shreveport to pay a penalty and attorney fees.
We reverse the judgment insofar as it deemed the hernia to be a work-related injury, awarded attorney fees, and assessed a penalty. In all other respects, the judgment is affirmed.
FACTS
Louis Flanigan, who was born in 1940, was employed as a recreation supervisor by Shreveport. In December of 2003, Flanigan injured his lower back when the Shreveport vehicle that he was driving was rear-ended (“2003 accident”).
Flanigan returned to work in the summer of 2005. He was taken off work again because of colon surgery in November of 2005. Following his recovery from the colon surgery, he returned to work again in April or May of 2006.
Flanigan filed a tort claim for his injuries arising out of the 2003 accident. He also received workers’ compensation benefits for the injuries that he sustained in that accident. Shreveport sought to recover those benefits. In June of 2006, Flani-gan and Shreveport reached a settlement in which Shreveport agreed to waive its lien for the workers’ compensation benefits it had paid to or on behalf of Flanigan. In return, Flanigan released | ^Shreveport from any and all liability for workers’ compensation benefits that might be payable because of the December 2003 accident.
*941 On August 3, 2006, Flanigan was involved in an auto accident while driving to a work-related event. He received no injuries in the accident. The next day, Flan-igan’s supervisor arrived at the recreational center where Flanigan worked in order to take him to Willis-Knighton Work Rare for a drug test. Flanigan, who was cleaning a center bathroom at the time, needed to move two five-gallon containers of cleaning fluid before he could leave with his supervisor. Ordinarily, Flanigan would have dragged the containers back to their storage location, but because he felt that he was in a rush, he picked up the containers and allegedly hurt his lower back and sustained a hernia (“2006 accident”).
Flanigan filed a disputed claim for compensation. Shreveport contended that his claim for benefits relating to his back injury was res judicata because of the earlier settlement.
Following a trial on the merits, the WCJ concluded that although Flanigan had a prior injury, the injury he sustained in the 2006 accident was “a new injury that either aggravated or caused the new injury[.]” The WCJ reasoned that Flanigan’s claim was not barred by res judicata because his current condition did not exist during the prior settlement. The WCJ further found that the aggravation of Flan-igan’s hernia was work-related.
Judgment was rendered ordering Shreveport to pay weekly TTD benefits from the date of the accident; assessing a penalty of $2,000 against Shreveport for its arbitrary and capricious failure to pay TTD benefits; | ^ordering Shreveport to pay $2,500 in attorney fees for its failure to initiate wage benefits; and ordering Shreveport to reimburse all medical expenses and to pay all past, present, and future medical expenses.
Shreveport has appealed. Flanigan has appealed seeking additional attorney fees for work performed on this appeal.
RES JUDICATA
Shreveport contends that the WCJ was clearly wrong in denying the exception of res judicata. The law on res judicata is set forth in La. R.S. 13:4231, which provides:
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
Under La. R.S. 13:4231, a second action is precluded by res judicata when all of the following are satisfied: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second |4suit arose out of the transaction or occurrence that was the subject matter *942 of the first litigation. Burguieres v. Pollingue, 2002-1385 (La.2/25/03), 843 So.2d 1049.
While the doctrine of res judicata is ordinarily premised on a final judgment on the merits, it also applies where the opposing parties have entered into a compromise or settlement of a disputed matter. See Ortego v. State, Dept. of Transp. & Dev., 96-1322 (La.2/25/97), 689 So.2d 1358. Thus, compromises have the legal efficacy of the thing adjudged. Ortego, supra.
The doctrine of res judicata is stricti juris, and any doubt concerning application of the principle of res judicata must be resolved against its application. Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210.
The standard of review of a ruling on an exception of res judicata is manifest error when the exception is raised before the case is submitted and evidence is received from both sides. Floyd v. City of Bossier City, 38,187 (La.App.2d Cir.3/5/04), 867 So.2d 993; Medicus v. Scott, 32,326 (La.App.2d Cir.9/22/99), 744 So.2d 192.

Medical treatment following the 2003 accident

The record is bare regarding the medical treatment received by Flanigan in the year after the 2003 accident. Dr. Michael Aura, an internal medicine physician, treated Flanigan on February 3, 2005. Flanigan reported that he still had an occasional back twinge. Dr. Aura noted that Flanigan had decreased his medication on his own. Although Flanigan had minimal tenderness in his back, Dr. Aura thought that overall, Flanigan’s 1 ficondition was much improved. Dr. Aura thought that Flanigan could return to work without restrictions in about two weeks.
Flanigan complained to Dr. Aura the next month about experiencing occasional back pain that occasionally radiated down his left leg, and occasional neck pain.
Flanigan reported to Dr. Aura on April 19, 2005, that he had only occasional back pain, and it occurred mostly at night. Dr. Aura thought that Flanigan would do just as well if he did not take Neurontin and Methadone, which had been prescribed by another physician. Dr. Aura gave him samples of Ultram, a nonsedating drug.
Flanigan had not yet returned to work in April of 2005 because he was awaiting cognitive testing as a result of the medications he had been prescribed. Dr. Aura could not think of any reason why Flani-gan could not return to work or that he needed to wait until he first underwent cognitive testing.
Dr. Aura examined Flanigan on June 14, 2005, for a yearly physical exam. Flani-gan’s history included chronic back pain. Flanigan told Dr. Aura that his back pain and leg pain were fairly well controlled, and he estimated his pain as being a 2 or a 3 on a 10-point scale. Dr. Aura’s report referred to an MRI from August 20, 2004, that showed moderate disc protrusion.
Flanigan complained to Dr. Aura the next month that he had lost the use of his left hand for one day, and that his left thumb was numb. The left thumb pain and numbness had disappeared when Flanigan saw Dr. Aura on | October 10, 2005. Flanigan still had some back pain, but he seemed to Dr. Aura to be doing better.
Flanigan underwent colon surgery in November of 2005. Dr. Aura did the preoperative examination, and among his impressions was chronic back pain. A preoperative report from pulmonologist Dr. Calvin Alexander on November 28, 2005, *943 reflected that Flanigan reported having chronic low back pain.
Dr. Sudar Tanga, who specialized in pain management and anesthesiology, treated Flanigan on March 27, 2006. Dr. Tanga noted that he examined Flanigan for chronic severe back, left hip, and left lower extremity pain. He also noted that Flanigan was doing significantly better with some weight loss and Neurontin, which he was currently taking. Dr. Tan-ga’s assessment was lumbar radiculopathy with low back pain secondary to degenerative disc disease following acute lumbar strain.

Medical treatment following the 2006 accident

When Flanigan was brought to Willis-Knighton Work Rare on the date he lifted the containers, he complained to Dr. Raymond Dennie about low back pain, numbness in his left arm and left hand, and pain in his left leg. Flanigan reported that he believed he hurt his back again after picking up the containers. Dr. Dennie remarked that he thought Flanigan’s pain behavior was markedly exaggerated. His diagnosis was low back pain, etiology unclear.
Dr. Carl Goodman, an orthopedic surgeon, first examined Flanigan on August 8, 2006. Flanigan’s main complaint was low back pain, with some 17left hip and leg pain secondary. An X-ray of Flanigan’s lower back showed mild spondylosis of the lumbar spine. Dr. Goodman’s impression was lumbar strain and sprain with mild spon-dylosis of the lumbar spine. Dr. Goodman ordered physical therapy and told Flani-gan that he could not go back to work at that time.
Flanigan returned to Dr. Goodman on August 18, 2006. His back pain had worsened, he still had left hip and leg pain, and he now complained of right hip pain and numbness in his left arm. There was no change in Dr. Goodman’s impression or recommendations. Physical therapy three times a week for four weeks was approved later that month.
Flanigan returned to Dr. Goodman on September 18, 2006. Flanigan’s lower back, hip, and leg pain was essentially the same. Flanigan said his neck was stiff and sore, and his left arm still felt numb. The only changes on examination were a slightly positive straight-leg raise on the left and numbness in all toes.
An MRI of the lumbar spine was done on October 3, 2006. It showed degenerative disc disease at L4-5 with asymmetric disc bulging on the right causing moderate foraminal stenosis.
Dr. Goodman next examined Flanigan on October 5, 2006. His complaints were essentially the same, although a new complaint was a possible abdominal hernia. If Flanigan had not been awaiting hernia surgery at the time, Dr. Goodman would have released him to light-duty work. Flanigan’s condition remained roughly the same when Dr. Goodman saw Flanigan later that month. It was noted that Flani-gan had indicated that | ^physical therapy had been helping him, but that physical therapy had since been denied.
Flanigan reported that he was still having back trouble when seen by Dr. Goodman on February 6, 2007. Examination of the lumbar and cervical areas was essentially negative, and Flanigan was shown to have nothing more than a little tenderness and some limited movements. Dr. Goodman would have probably returned Flani-gan to light-duty work at that time if he had had a release from his hernia repair.
Flanigan complained of mild low back pain to Dr. Goodman on March 20, 2007. The only abnormality was some tenderness in the lower back, which was a subjective complaint. Dr. Goodman saw Flanigan for *944 the last time on May 7, 2007. There were no changes from the March visit, and Dr. Goodman placed Flanigan at maximum medical improvement. His symptoms and exams were fairly normal, and there were no objective findings.
On July 26, 2007, Dr. Goodman wrote to an adjuster that Flanigan continued having low back pain from degenerative lumbar disc disease and his recent lumbar sprain and strain. Dr. Goodman noted that Flan-igan said he was unable to work because of back pain, which was based purely on subjective complaints of pain and X-ray evidence of degenerative disease. Dr. Goodman also wrote that he felt Flanigan was at maximum medical improvement.

|9The Settlement

The WCJ approved the settlement in June of 2006. Although Flanigan had an attorney representing him on his tort claim, he was without counsel for that workers’ compensation proceeding. The order of approval stated that Flanigan released Shreveport from any and all liability for workers’ compensation benefits or any benefits of any nature and kind, which might otherwise be payable under Louisiana’s workers compensation laws, arising out of the 2003 accident. The order further stated that Shreveport was released from any and all past, present, and future claims, demands for compensation, and any and all causes and rights of action that Flanigan may be entitled to under Louisiana’s workers’ compensation laws resulting from the 2003 accident when he sustained injuries to “his back, neck, right hip and right leg.”[1]

Did Flanigan suffer a new injury?

Dr. Karl Bilderback examined Flanigan for a second medical opinion on September 13, 2006. Flanigan told Dr. Bilderback that he instantly felt back pain after lifting the containers, and that his back pain increased significantly when entering the van that was to take him to Work Kare. Flanigan also told Dr. Bilder-back that at the time of the 2006 accident, he had completely recovered from his 2003 back injury and had been back to work for 18 months.
|10Dr. Bilderback’s assessment was a lumbar strain/sprain type of injury. Dr. Bilderback thought Flanigan could work in a light-duty position.
Dr. Bilderback believed that Flanigan’s problems were an extension of his 2003 injury, and that the 2003 injury was most likely the trigger for his current problems. Dr. Bilderback added that the lifting of the cleaning fluid containers most likely caused an exacerbation of his injury. Dr. Bilderback thought that Flanigan would reach maximum medical improvement in three months.
Dr. Goodman wrote on September 28, 2006, that he agreed with Dr. Bilderback’s findings. Dr. Goodman added that Flani-gan needed an MRI[2] to rule out more significant pathology, but that he should improve and recover over the next three months.
Dr. Goodman testified in his deposition that he disagreed with Dr. Bilderback’s finding that the lumbar sprain/strain was an extension of the prior injury. Dr. Goodman thought that Flanigan had some underlying back problems, but believed he *945 was asymptomatic for 18 months prior to his 2006 injury. Dr. Goodman thought that Flanigan recovered from his 2003 injury, was working, and then had a new injury. Dr. Goodman’s opinion on this was based solely on Flanigan’s representations, and he explained that he did not have much history about the 2003 accident and his understanding from Flanigan was that Flanigan had recovered from it. Dr. Goodman agreed the current lumbar sprain/strain was in the same location as the 2003 injury.
| nWhen it was pointed out to Dr. Goodman that Dr. Aura noted that Flanigan had chronic back pain in November of 2005, Dr. Goodman agreed that this showed Flanigan was not pain-free from the time he returned to work until the 2006 accident. Dr. Goodman agreed that the back pain recorded in November of 2005 tended to make it more probable than not that Flanigan continued to have problems with his low back even after he returned to work following the 2003 accident. Dr. Goodman also agreed that if other records showed that Flanigan continued to complain of back pain after he returned to work, it would make it more probable that the 2006 injury was an extension of the prior injury.
In his reasons for judgment, the WCJ stated:
The Court notes that res judicata does not apply because a new accident and injury was suffered and the new claim did not exist at the time of the 2003 accident. Legally, Mr. Flanigan and the City admitted and agreed in the previous litigation that [Flanigan] had returned to full duty at his regular job without restrictions and that [Flanigan] has reached maximum medical improvement. Practically, Mr. Flanigan continued to have a back condition, but was not under continuous treatment by a physician and was back at work with no restrictions until he lifted the two five-gallon containers. The records reflect that Mr. Flanigan was seen by physicians on February 15, 2005, and April 12, 2005, and then the medical records reveal a thirteen month gap in treatment until a visit on March 27, 2006. It is significant to the Court that Mr. Flan-igan was not restricted from working on the March 27, 2006, visit and that Mr. Flanigan continued to work until the August 4, 2006, accident. After carefully listening to Mr. Flanigan’s testimony and watching his demeanor and then reviewing the medical records, the Court finds that Mr. Flanigan was truthful in his testimony when he summarized his pre-August 2006 medical condition to the Court.
Also significant to the Court, was that the lifting of the buckets on the job was a new accident that caused a new injury- Mr. Flanigan returned to work and suffered a new injury, and as such it is compensable and not barred by res judicata. | ^Conversely, if Mr. Flanigan was making a new claim based on symptoms related to the 2003 injury with no intervening on the job accident, then it would be barred by res judicata.
Although the WCJ was not exactly correct about the gap in medical treatment, he understood what the medical records revealed about Flanigan’s condition. Flan-igan reported only occasional back pain to Dr. Aura in April of 2005. Flanigan told Dr. Aura in June of 2005 that his back pain and leg pain were fairly well controlled, and he estimated that his pain was low on a 10-point scale. Flanigan still had some back pain in October of 2005, but he seemed to Dr. Aura to be doing better. Chronic low back pain was noted in November of 2005. When Flanigan was examined in March of 2006, Dr. Tanga noted *946 he was seeing Flanigan for chronic severe back, left hip, and left lower extremity pain, but he also recorded that Flanigan was doing significantly better with some weight loss and Neurontin.
Flanigan was confronted at trial about his representations to an adjuster and to Dr. Bilderback that he had completely recovered from his 2003 injuries at the time of the 2006 accident.[3] Flanigan’s medical records show that he had symptoms of back pain as recently as five months prior to his 2006 accident. He was also confronted by a representation to Dr. Bilder-back that he had returned to work 18 months prior to his 2006 injury.
Flanigan returned to work in the summer of 2005, was off work again because of his colon surgery, returned to work again in April or May of | iS2006, then was taken off work following his 2006 accident. Flanigan stated that from the time he returned to work following colon surgery until August 4, he did not have any back problems or complaints about his back. He also stated that he may have had sporadic back pain from his 2003 injury, but it did not keep him from working. We note that when an adjuster asked Flanigan if he had fully recovered from his 2003 injury, he replied affirmatively and added that he had no problems working. Flanigan denied missing work because of his back once he returned to work in 2005 until his 2006 accident.
Flanigan testified that he felt a strain and that his back hurt the moment that he picked up the containers. He asserted that he told his supervisor about his condition when he entered the van to go to Work Rare.[4] When his supervisor drove him back to the recreational center, he told her that he was unable to work.
At trial, Flanigan denied ever taking Neurontin.[5] However, the March 27, 2006, record from Dr. Tanga stated that he was currently taking Neurontin and Dr. Tan-ga’s plan was to continue the Neurontin for chronic pain. Flanigan also testified at his February 2006 deposition that he was taking Neurontin. Flanigan explained at trial that he had been confused at the deposition about exactly which medication was Neurontin. In any event, the WCJ clearly stated that Flanigan provided truthful testimony about his medical condition prior to August of 2006.
| uMindful that the doctrine of res judi-cata is stricti juris, and that any doubt concerning application of the principle of res judicata must be resolved against its application, we cannot conclude that the WCJ was clearly wrong in finding that there was a new injury that was not covered under the 2006 settlement, and, thus, the exception of res judicata was properly denied.
HERNIA
Shreveport contends that the WCJ was clearly wrong in finding that Flani-gan’s abdominal hernia was causally related to his employment. La. R.S. 23:1221(4)(r)(i) states:
In all claims for inguinal hernia, it must be established by a preponderance of *947 the evidence that the hernia resulted from injury by accident arising out of and in the course and scope of employment, that the accident was reported promptly to the employer, and that the employee was attended by a licensed physician within thirty days thereafter.
Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551. To reverse a factfinder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a | ^reasonable one. Id. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.
Dr. Andrew Werner is a colon and rectal surgeon. He first saw Flanigan on November 21, 2005, on a referral from a gastroenterologist for colon polyps. Surgery was performed on Flanigan’s colon on November 29, 2005. Flanigan had no complaints and was completely healed and without any identifiable hernias on March 16, 2006. His next scheduled visit with Dr. Werner was in six months.
Dr. Werner saw Flanigan on August 9,' 2006, for a followup visit. Flanigan complained of a little bit of abdominal pain in the area where he had the surgery. There was no evidence of hernia, but Dr. Werner testified that because Flanigan was overweight, it would have been difficult to entirely rule out a hernia. Flanigan claimed he told Dr. Werner at that time about the accident and how it caused his abdominal pain, but the record from that visit does not reflect why Flanigan complained about abdominal pain to Dr. Werner. Dr. Wer-ner stated in the report that he thought Flanigan might have just recently strained a muscle.
Flanigan reported his hernia to a physical therapist on August 23, 2006. The therapist wrote that Flanigan had an increase in hernia to his abdominal incision in the past few weeks.
Flanigan claimed he told Dr. Goodman on August 8, 2006, that his stomach was hurting, and Dr. Goodman responded that he could not treat 116him for that. However, this is not reflected in Dr. Goodman’s medical records. The hernia was not mentioned when Dr. Goodman examined Flani-gan again that month or in September. It was not until the October 5 visit that Flan-igan complained to Dr. Goodman about a possible abdominal hernia.
Dr. Werner saw Flanigan on October 4, 2006, for evaluation of pain at his incision. Flanigan said he had been having the pain for a couple of months. Dr. Werner thought the pain might be related to an incisional hernia, and ordered a CT scan. A CT scan on October 9 showed a hernia, with only intra-abdominal fat protruding through muscle.
Dr. Werner met with Flanigan on October 18, 2006, to discuss the CT scan. Dr. Werner told Flanigan that he had an inci-sional hernia and needed surgery to repair it. Flanigan told Dr. Werner that the hernia happened after he lifted something *948 heavy at work. The hernia repair surgery was performed on October 31, 2006.
Flanigan asserted that from the time of the colon surgery until August 4, 2006, he did not have problems or pains in the location of the surgery. Flanigan added that he did not start feeling abdominal pain until a few days after the accident.
The WCJ stated that he found that Flanigan met his burden, through Dr. Werner’s records, that the aggravation of the hernia injury occurred only after he lifted the two containers on August 4, 2006.
Dr. Goodman testified that he did not think the hernia was from the August 2006 accident, and he thought that Flanigan had the hernia prior to |17that accident. Although Dr. Goodman would defer to Dr. Werner about the hernia, Dr. Goodman felt that Flanigan should have told him about the hernia in August if he had sustained it at that time.
Dr. Werner thought it was possible that the hernia was caused by lifting the containers. When asked if it was more probable than not that the hernia was caused by the lifting if no other circumstance could have caused it, Dr. Werner replied that it was hard to say one way or the other without knowing what else had happened. When asked if he could say it was more probable than not that the hernia was caused by the lifting if Flanigan had no complaints of pain prior to the accident, Dr. Werner replied that it was possible but that there was no way to know for certain. In sum, Dr. Werner never used the magic words that it was more probable than not that lifting the containers caused Flani-gan’s incisional hernia.
While Flanigan mentioned having a hernia to a physical therapist, Flanigan did not mention the hernia to Dr. Dennie at Work Kare, and he did not initially report the hernia to Drs. Goodman and Werner. He complained of abdominal pain to Dr. Werner a few days after the accident, but he did not mention the accident. We note that visit was a followup visit for the colon surgery. Dr. Goodman did not become aware of the hernia until October.
Based upon Flanigan’s delay in reporting the hernia to his physicians, as well as Dr. Werner stating that there was only a possibility that the 2006 accident caused the hernia, we conclude that the WCJ was clearly wrong in finding that the hernia was aggravated by the lifting of the containers.
| ^PENALTIES & ATTORNEY FEES
Shreveport argues that the WCJ abused his discretion in assessing a penalty and awarding attorney fees. The WCJ found that Shreveport was arbitrary and capricious in failing to initiate wage benefits.[6]
La. R.S. 28:1201(F) provides, in part:
Failure to provide payment in accordance with this Section or failure to consent to the employee’s request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dol *949 lars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers’ compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers’ compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
In order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base the denial of benefits. Koenig v. Christus Schumpert Health System, 44,244 (La.App.2d Cir.5/13/09), 12 So.3d 1037; Howard v. Holyfield Construction, Inc., 38,728 (La.App.2d Cir.7/14/04), 878 So.2d 875, writ denied, 2004-2303 (La. 1/7/05), 891 So.2d 684.
A WCJ has great discretion in awarding or denying penalties and attorney fees. Nowlin v. Breck Const. Co., 30,622 (La.App.2d Cir.6/24/98), 715 So.2d 112.
Shreveport reasonably controverted the claim. Flanigan basically suffered a similar injury in the same location as the 2003 injury that was the subject of the settlement. Although Flanigan maintained that the 2003 injury had resolved enough to return to work, he continued to receive medical treatment for that injury five months before the 2006 accident. Furthermore, Dr. Bilderback had concluded that the 2006 injury was more likely than not a continuation of the 2003 injury. Under these circumstances, the WCJ abused his great discretion in assessing a penalty and awarding attorney fees.
CONCLUSION
We reverse the judgment insofar as it deemed the hernia to be a work-related injury, awarded attorney fees, and assessed a penalty. In all other respects, the judgment is affirmed.
With Louis Flanigan to bear his own costs, and the City of Shreveport to pay its costs of $146.50, the judgment is REVERSED IN PART AND AFFIRMED IN PART. '

. We note that the joint petition for settlement approval states that Flanigan had been initially diagnosed with lumbar and cervical muscle strain and severe degenerative joint disease of the knee. It also reflects that Flanigan additionally complained of neck pain radiating down both arms as well as left hip pain.

. As noted earlier, an MRI of the lumbar spine was done on October 3, 2006.

. Flanigan did not indicate to Dr. Goodman on August 8, 2006, that he had low back problems after returning to work following the 2003 accident, although the record shows that Flanigan told Goodman that he was rear-ended in December of 2003 and returned to work after about 9 months and did well.

. Flanigan regarded his relationship with his supervisor as "hostile.”

. Shreveport contends that this denial, other trial testimony by Flanigan, and what Flani-gan told the adjuster and Dr. Bilderback about the extent of his recovery, amounted to fraud.

. The WCJ found that Shreveport was not arbitrary and capricious in failing to approve physical therapy or in failing to pay for treatment by Dr. Werner for the hernia issues.